# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4025 | **DATE** | 3/29/2001 |
| **CASE TITLE** | John Paquet, an individual vs. Pace, The Suburban Bus Division of the Regional Transportation Authority; and Joseph DiJohn, in his official capacity | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion for summary judgment [24-1] is granted. Plaintiff may file a motion for leave to amend his complaint based on new evidence of discrimination within 30 days. If no such motion is filed within 30 days, final judgment will be entered in favor of defendants.

(11) ■ [For further detail see

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| ✓ | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

MAR 30 2001
date docketed

MAR 30 2001
date mailed notice

docketing deputy initials

mailing deputy initials

courtroom deputy's initials

Date/time received in central Clerk's Office

OR DOCKETING
01 ... 29 PM 3:32

Document Number

50

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOHN PAQUET, an individual,      )
                                       )
              Plaintiff,      )
        v.                      )      Case No. 99 C 4025
                                         )
PACE, THE SUBURBAN BUS DIVISION OF      )
THE REGIONAL TRANSPORTATION            )      Honorable Judge Joan B. Gottschall
AUTHORITY; and JOSEPH DiJOHN, in his      )
official capacity                         )
              Defendants.      )

**DOCKETED**

MAR 3 0 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff John Paquet, who identifies himself as a homosexual, sued his employer Pace, the Suburban Bus Division of the Regional Transportation Authority, a regional governmental body, and Joseph DiJohn, the former Executive Director and highest ranking employee of Pace, in his official capacity.[1] Paquet's complaint makes two separate claims, each based on the protections that 42 U.S.C. § 1983 affords public sector employees. In Count I, Paquet alleges that the defendants retaliated against him for engaging in certain speech concerning homosexuality and homosexual rights issues, in violation of the First Amendment. In Count II, Paquet alleges that the defendants violated the Equal Protection Clause of the Fourteenth Amendment by intentionally discriminating against him based on his status as a homosexual. The defendants have moved for summary judgment on all counts. For the reasons set forth

---

[1] Claims against state officials in their official capacity are, in reality, claims against the governmental body itself. *See Tabor v. City of Chicago*, 10 F. Supp. 2d 988, 991 (N.D. Ill. 1998). Thus, the analysis that follows, discussing the claims against Pace, applies with equal force to the claims against DiJohn.

below, defendants' motion is granted.

## Background

Because the court is considering the defendants' motion for summary judgment, the following facts are taken from the record as viewed in the light most favorable to Paquet. Where facts are disputed the court will assume that Paquet's version of the facts is correct.[2] Paquet began his employment at Pace in January 1985. From January, 1994 to mid-1997, Paquet was employed at Pace under the official title of Section Manager of the New Technology Section, a subpart of the Operations Analysis Department. In this position, three full-time employees reported directly to Paquet. At the time, the New Technology Section was focused primarily on the development and implementation of the Transit Vehicle Management System ("TVMS"), an electronic system to be installed on all of Pace's buses that would collect and compile information concerning bus locations, fares, and passengers and continuously transmit that information to Pace headquarters. Paquet's duties included coordinating the efforts of implementing the TVMS system, and Paquet maintained a significant role in the TVMS project. In February, 1997, after soliciting bids, evaluating the budget, and performing a cost/benefit

---

[2] It should be noted, however, that the court has intentionally ignored statements of "fact" made by Paquet that contain nothing more than legal argument or interpretation without adequate factual support in the record. For instance, paragraph 53 of Paquet's statement of fact states: "Under the pretext of Paquet's position having been obviated by the cancellation of the TVMS project, DiJohn instructed Metzger to fire Paquet. (Metzger Dep. 88:16-21)." (Pl.'s Statemt. of Fact, ¶ 53). However, the cited portion of Metzger's deposition indicates only that Paquet's position was selected for elimination because of its connection to the TVMS project. There is no suggestion that it was a pretextual reason for elimination of the position. If anything, Metzger's testimony, viewed as a whole, shows that the cancellation of the TVMS project was the *true* reason for the reorganization. (Metzger Dep. at 88-90). Paragraphs 59-60, alleging that DiJohn and other Pace employees entered into and carried out a plan to discriminate against and harass Paquet, are other notable examples of conclusory legal arguments.

analysis of the TVMS, Pace decided to cancel the TVMS project. Instead, Pace would try to achieve some of the same objectives with a new, scaled down project, later titled the Intelligent Bus System. The new project was to be led by the head of the Management Information Systems ("MIS") department, rather than by the leaders of the New Technology Section.

Just prior to the decision to cancel the TVMS project, Pace had submitted a proposed budget for 1997 that included eight new positions, including two new positions in the MIS department to handle the implementation of a separate fare card reader project. Pace's actual approved budget for 1997 fell short of its proposal, however. In order to create the new MIS positions, Pace had to eliminate two existing positions elsewhere. Given that the TVMS project had now been canceled, DiJohn, the Executive Director of Pace, initially considered eliminating Paquet's position as Section Manager of the New Technology Section. It was later determined that the position of Paquet's supervisor, William Reynolds, should be eliminated instead. This decision was apparently based, at least in part, on the fact that Reynolds, as head of the Operations Analysis department, had more involvement with the TVMS project than Paquet. After the termination of Reynolds' position, the Operations Analysis department "ceased to exist." (Def.'s Statemt. of Fact, ¶ 28). Six of the eight employees who had worked in that department, including Paquet, were transferred to another department - Operations Planning. The functions previously performed by the Operations Analysis department were now transferred and consolidated into the Operations Planning department. Pace was apparently concerned about maintaining Paquet's position as a Section Manager in the new department, given that there were others within the department awaiting promotion to such a position who had greater seniority. Moreover, one of the candidates with greater seniority than Paquet was an African-American

3

female, and Pace apparently feared the possibility that she would bring a discrimination lawsuit if denied the promotion. Pace considered making Paquet a Section Manager of some other sections, but each alternative was rejected, either because Paquet did not have the necessary experience or because other employees within the section had greater seniority and experience. Instead, Pace gave Paquet the position of Senior Operations Planning Administrator and reduced his grade level from 9 to 8. Paquet's salary was not reduced, although the maximum pay for grade level 8 is less than the maximum pay for grade level 9. Thus, Paquet's earning potential within the same grade level was decreased. Pace contends that Paquet's grade level was reduced because he was no longer directly supervising other employees. Paquet disputes Pace's justification for the grade level decrease, and points to one other Pace employee who is a grade level 9 despite not having supervisory authority over other employees. It is undisputed that no other employee involved in this particular reorganization was demoted to a lower grade level. There is some evidence, however, that other previous reorganizations have resulted in the demotion of other employees to lower grade levels.

At about the same time that Pace was considering the placement of Paquet, Pace discovered several suspicious e-mail messages sent to only a few Pace employees, including both Paquet and Reynolds. The e-mails seemed to indicate that the employees receiving the message had expressed interest in participating in a group. (Def.'s Statemt. of Fact, Exh. 25) ("It is time. We will start the group with the above listed members."). The e-mails also suggested that certain disruptive behavior would be directed at Pace and its high-level employees. (Def.'s Statemt. of Fact, Exhs. 26-27). Included in the e-mails were references to napalm and C4 bombs, hacking, and (computer) viruses. Pace's employment attorney initiated an investigation of the e-mails.

An investigator interviewed all of the recipients of the e-mails. Prior to scheduled interviews of Paquet and Reynolds, the two went to Margaret Fugiel, Pace's Director of Human Resources, and demanded written guarantees from DiJohn and Pace's general counsel that their rights would not be violated, although they did not specify which rights they were referring to. After speaking with DiJohn and Pace's counsel, Fugiel again met with Paquet and Reynolds, to inform them that their demands for written assurances would not be met. This time, Reynolds admittedly used profanity, although Paquet maintains that it was not directed at Fugiel. Reynolds did, however, direct at least one comment at Fugiel, telling her that she would "burn in hell." (Def.'s Statemt. of Fact, ¶ 42). Paquet tries to soften the characterization of the confrontation, but still admits that "Reynolds in a joking, non-aggressive manner did tell Fugiel 'Peggy, you're going to burn in hell.'" (Pl.'s Resp. to ¶ 42). In this second meeting, Paquet stood by and was supportive of Reynolds' position, but was not loud or profane. Fugiel testified that Paquet refused to leave her office for several minutes after the meeting, demanding that he be given written guarantees. Paquet disputes this, claiming that he left immediately after he was requested to do so. Fugiel then reported the incident to DiJohn, who decided that Reynolds should receive a one week suspension, but that Paquet should receive only a written reprimand. A written reprimand was issued to Paquet on June 16, 1997. As mentioned above, Reynolds was subsequently terminated in connection with the reorganization.

Paquet believes that his status as a homosexual played a part in his demotion, the investigation of the e-mails, and his subsequent reprimand. In addition, Paquet claims that he was subjected to a hostile work environment. Paquet's homosexuality (or at least the likelihood that he was homosexual) was revealed in a memo sent by Paquet to one of his supervisors in

5

March, 1997, requesting that Pace adopt a policy of providing insurance benefits to homosexual domestic partners in the same way that it does for married spouses. Although Paquet did not make a point of discussing his homosexuality at Pace, there were at least some Pace employees who knew of his homosexual orientation even before this memo was sent.

With respect to the hostile work environment, Paquet testified that during his career at Pace he occasionally heard derogatory jokes regarding homosexuals or the use of derogatory terms describing homosexuals.[3] He testified that, dating back to 1985, he heard Joseph DiJohn and two other employees utter such comments about six to twelve times each. It is undisputed that none of the jokes or remarks were directed at Paquet. Paquet also asserts that some Pace employees were instructed not to talk to Paquet, or to stay away from Paquet, although he admits that there is no evidence that they were so instructed because of Paquet's status as a homosexual. Paquet also points to a training incident. During a training session on sexual harassment, Paquet insisted that the instructor acknowledge that a certain local ordinance prohibited Pace from discriminating on the basis of sexual orientation. The instructor, who was unfamiliar with the local ordinance, conferred with Pace's general counsel. Pace's counsel told the instructor not to discuss the issue because Paquet was, at that time, involved in litigation with Pace over that particular ordinance. Paquet continued to insist that the instructor discuss the matter. The

---

[3] In addition to the conditions and events described in the text of this opinion, Paquet also makes several generalized allegations about the culture and environment at Pace. For instance, Paquet offers evidence that Pace's Deputy Executive Director told him that it was necessary to drink, gamble, and party with DiJohn in order to "get ahead" at Pace. (Pl.'s Statemt. of Fact, ¶ 11). Paquet characterizes Pace as an "old boys club." (Pl.'s Resp. at 1). In addition, Paquet points to incidents and comments suggesting that Pace constituted a hostile work environment for women. As will be discussed in further detail below, these allegations are tangentially relevant, at best, to the determination of whether Paquet was subjected to a hostile work environment based on his status as a homosexual.

instructor then left the meeting in order to seek out Paquet's supervisor and have him speak with Paquet or remove him from the class. When they returned, Paquet had left the training session. Finally, Paquet points out that he has been subjected to a "Wellness Newsletter," distributed at Pace, that carries a regular column by a doctor who "is the head of an organization which actively advocates the position that homosexuals suffer from mental illness which can be cured as well as other equally offensive positions." (Pl.'s Statemt. of Fact, ¶ 77). After Paquet requested that the newsletter not be distributed, the Pace employee to whom the request was made "didn't even question whether it was actually appropriate" to continue to distribute the newsletter. (Pl.'s Statemt. of Fact, ¶ 77). It is undisputed that the newsletter column did not address any homosexual issues.

In connection with his First Amendment claim, Paquet claims that he was retaliated against for exercising his right to free speech. The complaint includes, as instances of Paquet's protected speech, the following: advocacy of a benefit program that would extend coverage to homosexual employees' domestic partners; objection to Pace's inclusion of a cap on benefits for AIDS-related illnesses; advocacy of Paquet's belief that homosexuals should be considered a class of persons deserving protection from discrimination and unequal treatment; and objection to the newsletter, described above, containing an article written by a person known to advocate a view that homosexuality is a disease that can be cured.

### Analysis

Defendants have moved for summary judgment on both the Equal Protection claims (Count I), and the First Amendment claim (Count II). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. *See Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Both of Paquet's claims are founded on 42 U.S.C. § 1983, which prohibits state actors from depriving persons of any rights, privileges, or immunities secured by the Constitution, including the First and Fourteenth Amendments. 42 U.S.C. § 1983. The court will first consider Paquet's Fourteenth Amendment equal protection claim, and then turn to his First Amendment claim.

## I. Equal Protection

Paquet alleges that Pace deprived him of his right to equal protection by treating Paquet differently from those Pace employees who were not homosexual or who were not perceived to be homosexual. Although the complaint is not clear on this point, Paquet apparently advances two distinct theories: first, that he was discriminated against on the basis of his sexual orientation when Pace demoted him, and second, that he was subjected to a hostile work

8

environment because of his sexual orientation.

Paquet's claims highlight some important questions about the degree of protection due a homosexual government employee under the Equal Protection Clause. In the Title VII context, it is clear that employees (both public and private) are entitled to protection from same-sex harassment *because of one's sex*. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). But it is equally clear that Title VII does not protect against discrimination "based solely upon a person's sexual preference or orientation (and not on one's sex)." *See Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1084 (7th Cir. 2000). In the equal protection context, however, homosexuals, as an identifiable minority, are entitled to some level of protection. The obvious question is whether sexual orientation is a suspect classification subject to strict scrutiny; a quasi-suspect classification, like sex, subject to intermediate scrutiny; or neither, subjecting the classification only to rational basis review. In *Romer v. Evans*, 517 U.S. 620 (1996), the Supreme Court purported to use a form of rational basis to review a law classifying on the basis of sexual orientation, without ever expressly stating that homosexuality is not a suspect or quasi-suspect class. Neither the Supreme Court nor the Seventh Circuit have provided a definitive answer. Nor does this case present the court with the need to resolve the question.

In race and sex employment discrimination cases under the Equal Protection clause (brought by public employees pursuant to § 1981 or § 1983), courts have frequently looked to the framework of Title VII for guidance. *See, e.g., Collins v. State of Ill.*, 830 F.2d 692, 698 (7th Cir. 1987); *Pilditch v. Board of Educ. of the City of Chicago*, 3 F.3d 1113, 1116 (7th Cir. 1993). The Title VII framework gives employment discrimination plaintiffs an opportunity to avoid summary judgment on a claim of intentional discrimination, even when lacking direct evidence

of intent, through the *McDonnell-Douglas* burden-shifting scheme, which will be discussed in more detail below.[4] It is unclear whether a plaintiff claiming discrimination on the basis of a non-protected class would be entitled to a similar procedural "boost" to help him overcome summary judgment. Nonetheless, the court finds that even if Paquet is given the benefit of the Title VII procedural framework, he cannot avoid summary judgment. Thus, the discussion below assumes (as the parties apparently did) that Paquet is entitled to proceed under Title VII's *McDonnell-Douglas* scheme.

### *Demotion*

Under the *McDonnell-Douglas* approach, Paquet can make out a *prima facie* case of disparate treatment discrimination by showing: 1) that he was a member of the protected class; 2) that he performed his job satisfactorily; 3) that he suffered an adverse employment action; and 4) that Pace treated similarly situated employees outside his class more favorably. *Russell v. Board of Trustees of Univ. of Ill. at Chicago*, No. 00-2095, ___ F.3d ___, 2001 WL 225051, at * 3 (7th Cir. Mar. 8, 2001); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973). If Paquet successfully establishes a *prima facie* case, then the burden shifts to Pace to articulate a legitimate, nondiscriminatory reason for the adverse actions. *See id.* If Pace does so, then the burden shifts back to Paquet to present evidence to create a triable issue with respect to whether Pace's proffered explanation is pretextual. *See id.* Paquet can show pretext by showing that

---

[4] In contrast, a *prima facie* case of an equal protection violation requires a plaintiff to show that: 1) he is a member of a protected class, 2) he is otherwise similarly situated to members of the unprotected class, 3) he suffered an adverse employment action, 4) he was treated differently from members of the unprotected class, and 5) the defendant acted with discriminatory intent. *See McPhaul v. Board of Comm'rs of Madison Cnty.*, 226 F.3d 558, 564 (7th Cir. 2000). Applying *McDonnell-Douglas* would permit a plaintiff to avoid summary judgment even without direct evidence of the fifth element.

Pace's explanation has no basis in fact, that the explanation given was not the real reason, or that the reason given was insufficient to warrant the adverse action. *See Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996).

Paquet apparently complains of only one adverse employment action - his demotion to a grade level 8 position.[5] Although there are questions as to whether Paquet can make out a *prima facie* case with respect to the demotion, the court will assume for the sake of argument that Paquet has successfully established a *prima facie* case.[6] Pace has offered a legitimate, nondiscriminatory reason for the demotion. Pace argues that the reorganization made the placement of Paquet difficult, and that, after considering other alternatives, he was given the non-supervisory position of Senior Operations Planning Administrator. Pace explains that his grade level was reduced because he no longer had supervisory authority over other employees.

The burden now shifts back to Paquet, who must show a triable issue of fact as to whether Pace's reason is pretextual. Paquet fails to do so. Paquet argues that although the reorganization justified the transfer to another department, it did not justify his demotion to a lower grade level. The court initially notes that had Pace decided to eliminate Paquet's position and terminate

---

[5] Although the written reprimand might qualify as an adverse employment action, Paquet concedes in his response brief that he is not contending that the reprimand itself was a violation of § 1983, but rather that the reprimand contributed to a hostile work environment.

[6] It is arguable that Paquet is unable to meet the fourth prong of the *McDonnell-Douglas* test with respect to the demotion. Although no other employee involved in this particular reorganization was demoted a grade level, Pace has produced evidence showing that other, presumably heterosexual employees have been demoted in connection with prior reorganizations. Because the court finds that Pace has offered a legitimate, nondiscriminatory reason for the demotion, and that Paquet is unable to create a triable question of fact as to whether that reason is pretextual, the court need not determine whether Paquet is able to meet the fourth prong of the *prima facie* case.

Paquet entirely, as it unquestionably was considering as an alternative, then Paquet's claim would clearly fail. There is no evidence in the record suggesting that a termination would not have been supported by the legitimate, nondiscriminatory justification that Pace needed to reorganize after the cancellation of the TVMS project. The court is reluctant to punish Pace for saving Paquet's job by transferring him and demoting him one grade level.

More to the point, however, is Paquet's failure to produce sufficient evidence that the reason given for the demotion itself was pretextual. Pace argues that Paquet no longer had a supervisory role, and that it therefore reduced his grade level by one. (See Def.'s Statemt. of Fact, ¶ 35). Paquet responds by pointing to one other Pace employee who was beyond grade level 9, but was not a manager. But this evidence establishes only that Pace does not have a rigid policy, from which it never deviates, that all grade level 9 or higher employees must have supervisory or managerial duties. That is not sufficient to create a question of fact as to pretext. *See Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (where employer had general policy of laying off least senior employees first, and recalling them last, plaintiff who was less senior than recalled employees did not create triable question as to pretext by pointing out that employer had departed from the general seniority policy on one or two occasions in the past). The fact that Pace has, in the past, made one exception to a general, but not entirely rigid, policy does not show that Pace was not motivated by that general policy in this case. *See id.* As the Seventh Circuit has repeatedly admonished, it is not the province of the district court to sit as a super-personnel department that re-examines an employer's business decisions. *See, e.g., Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1044 (7th Cir. 2000).

Because Paquet fails to create sufficient evidence from which a reasonable jury could

conclude that Pace's reasons for the transfer and demotion are pretextual, Pace is entitled to

summary judgment on Paquet's disparate treatment claim.

### Hostile Work Environment

The second theory of discrimination that Paquet advances is that he was subjected to a

hostile work environment because he was homosexual. In a Title VII case involving sexual

harassment, the Seventh Circuit listed the elements for a *prima facie* case of hostile work

environment discrimination:

> [A] plaintiff must show that: (1) she was subjected to unwelcome
> sexual harassment in the form of sexual advances, requests for
> sexual favors or other verbal or physical conduct of a sexual
> nature; (2) the harassment was based on sex; (3) the sexual
> harassment had the effect of unreasonably interfering with the
> plaintiff's work performance in creating an intimidating, hostile or
> offensive working environment that affected seriously the
> psychological well-being of the plaintiff; and (4) there is a basis for
> employer liability.

*Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). The Seventh

Circuit has also stated that a § 1983 claim based on hostile work environment discrimination

generally "follows the contours of Title VII claims." *See King v. Board of Regents of Univ. of

Wisc. Syst.*, 898 F.2d 533, 537 (7th Cir. 1990). Indeed, the elements of the claims are the same,

except that a plaintiff asserting a § 1983 claim must also prove that the defendant had a

discriminatory purpose. *See Needy v. Village of Woodridge*, No. 96 C 5188, 1997 WL 461093,

at *6 (N.D. Ill. Aug. 8, 1997) ("With respect to the hostile work environment claim, the only

difference between Title VII and section 1983 is that to state a section 1983 claim, [the plaintiff]

must prove the [defendant] acted with a discriminatory purpose.").

As to the third prong, the Seventh Circuit has used the same standard for determining

what constitutes a "hostile or offensive working environment" in a § 1983 claim that it applies in Title VII cases. *See, e.g., McPhaul v. Board of Comm'rs of Madison Cnty.*, 226 F.3d 558, 566 n.6 (7th Cir. 2000). That standard requires a plaintiff to show that his work environment was both subjectively and objectively hostile. *See McPhaul*, 226 F.3d at 567. In determining whether a work environment is objectively hostile the court "must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993)).

In support of his hostile work environment claim, Paquet relies on evidence of offensive comments and jokes. He also points to the Deputy Executive Director's comment that in order to "get ahead" at Pace it was necessary to drink, play cards, and generally socialize with DiJohn and "his cohorts." (Pl.'s Resp. at 11). In addition, Paquet argues that the investigation and reprimand in connection with the e-mails and Fugiel meetings contributed to the hostile environment, because the timing of these actions gives rise to an inference that Paquet was "targeted because he is a homosexual." (Pl.'s Resp. at 12). Finally, Paquet contends that Pace isolated him by excluding him from the training session and by instructing other employees to stay away from him or not talk to him.[7]

---

[7] Paquet also refers to the "Wellness Newsletter," stating that Pace was implicitly endorsing a view offensive to homosexuals, and that Pace's indifference was demonstrated by its lack of concern about his complaint concerning the newsletter. The distribution of the newsletter, and Pace's refusal to discontinue its distribution, could hardly be characterized as conduct sufficiently severe or pervasive to establish a hostile work environment. It is undisputed that the newsletter contained no articles dealing with issues of sexual orientation. The fact that the newsletter may still have been subjectively offensive to Paquet does not establish that it

Examining all of the circumstances and bearing in mind the factors set forth in *Harris*, the court concludes that Paquet's proffered evidence is insufficient to create a triable issue of fact as to whether he was subjected to a hostile environment because he is homosexual. The evidence of homophobic comments and jokes is insufficient to avoid summary judgment, because it fails to show harassment that is sufficiently severe or pervasive. First, the comments were few, and very far between. Paquet claims that there were between 18 and 36 total instances in which an offensive joke or comment was uttered, over the course of approximately twelve years. *See Russell*, 2001 WL 225051, at *5-*6 (several examples of supervisor's offensive behavior and comments within one year time span were insufficient to raise question of fact as to hostile work environment, in part because they were few and far between). More importantly, none of the jokes or comments were ever directed at Paquet personally. The Seventh Circuit has expressly noted that harassment directed at someone other than the plaintiff is not as severe as harassment directed at the plaintiff. *See McPhaul*, 226 F.3d at 567; *Russell*, 2001 WL 225051, at *5-*6.[8] In *McPhaul*, the Seventh Circuit upheld summary judgment in favor of an employer where an employee claimed that another employee's repeated use of racial epithets and offensive comments constituted a hostile work environment. *See id.* In that case, the plaintiff alleged that the employee's comments occurred on a weekly basis, but admitted that they were never directed at her. The court, in affirming the district court, stressed that the comments were never directed at plaintiff, did not interfere with her work performance, and were not physically threatening or

---

constituted an objectively hostile environment. *See McPhaul*, 226 F.3d at 567.

[8] In this case, it appears that the offensive jokes and comments were directed against no one in particular, but were rather insensitive comments about homosexuals generally.

15

humiliating. *See id.*

In *Russell*, the offensive comments were made by the plaintiff's supervisor. The court upheld summary judgment because the "statements were few and far between, they were not physically threatening, they were not sexually suggestive, and while they may have been offensive, they were not so offensive as to constitute actionable conduct." *Russell*, 2001 WL 225051, at *6. Similarly, Paquet has not shown that the comments and jokes at issue in this case were ever directed at him, that they ever interfered with his work, or that the other Pace employees ever threatened or personally humiliated him. In short, the occasional anti-gay comments and jokes were not sufficiently severe or pervasive to rise to the level of an actionable hostile work environment.

Paquet's allegation that it was necessary to socialize with DiJohn and his friends in order to "get ahead" at Pace is also insufficient to overcome summary judgment. In no way does this claim, even if proven, establish that Paquet was discriminated against *because he was a homosexual.*[9] Like the sex discrimination plaintiffs in *Parkins* and *Oncale*, Paquet must show that he was discriminated against because he was in the protected class.[10] *See Parkins*, 163 F.3d at 1032; *Oncale*, 523 U.S. at 78 (Title VII plaintiff failed to show that he was discriminated against because of his sex); *see also Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514, 517 (7th

---

[9] Moreover, evidence of promotion denials, reprimands, or other such adverse actions generally does not bear on whether Paquet's working environment was hostile. Rather, such allegations, if adequately supported, are potential bases for claims of disparate treatment discrimination. *See generally Cowan v. Prudential Ins. Co. of America*, 141 F.3d 751, 759 (7th Cir. 1998).

[10] The term "protected class," as used here, is not meant to suggest that sexual orientation is a protected class under Title VII, or that sexual orientation is a suspect or quasi-suspect class under Fourteenth Amendment equal protection analysis.

Cir. 1996). Paquet fails to meet this requirement because he has produced no evidence to link the socialization requirement with his sexual orientation. Paquet does not allege that he was excluded from the gatherings attended by DiJohn and his friends because of his sexual orientation. Nor does Paquet allege that he attempted to attend the gatherings and was subjected to hostility or offensive conduct on account of his sexual orientation.

For the same reason, evidence of the investigation and reprimand do not help Paquet establish a hostile work environment. There is absolutely no evidence tying the investigation and reprimand to Paquet's homosexuality. In fact, Reynolds, a heterosexual, was investigated and suspended in connection with the same incidents. Although Reynolds' conduct at the meeting was more disruptive than Paquet's conduct, his relatively similar treatment with respect to the e-mails and Fugiel meeting tends to suggest that there was no link between Paquet's treatment and his homosexuality. Paquet tries to avoid this conclusion by pointing to the timing of the investigation and reprimand - shortly after he had submitted a memorandum to Pace concerning homosexual benefits issues. Although suspicious timing can sometimes provide circumstantial evidence from which an inference of discrimination may be drawn, *see Gorence v. Eagle Food Ctrs., Inc.*, ___ F.3d ___, No 99-2102, 2001 WL 225432, at *2 (7th Cir. Mar. 8, 2001), such an inference is not justified here. The investigation began shortly after the e-mails were discovered, in May, 1997. Paquet's memo was sent in March, 1997, approximately two months earlier. There are no other circumstances suggesting that the reprimand was discriminatory. The discovery of the e-mails was itself entirely sufficient to explain the investigation, and a sufficient intervening cause to weaken substantially any putative inference based on timing alone. *See generally Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir.2000); *Paluck v. Gooding*

17

*Rubber Co.*, 221 F.3d 1003, 1009 (7th Cir. 2000).

Paquet's remaining evidence of a hostile work environment, that he was excluded from the training session and intentionally isolated from other Pace employees, is also insufficient to overcome summary judgment. His exclusion from the training session was an isolated incident that does not rise to the level of severity or pervasiveness necessary to create a hostile work environment. Further, there is no evidence to establish that he was removed from the training session because he was homosexual. To the contrary, the undisputed evidence suggests that he was removed because he was disrupting the class by insisting that the instructor make an admission that might have damaged Pace's legal position in an ongoing lawsuit with Paquet. (Def.'s Statemt. of Fact, ¶¶ 66-68). Paquet's behavior at the session and his pending litigation at the time would certainly suggest that Pace was well aware that Paquet was a homosexual. But that is not evidence that Pace removed him from the session *because* he was homosexual.

Similarly, Paquet has no evidence to link his claim that other employees were instructed to not talk to him with his status as a homosexual. Paquet claims that other employees were so instructed in, or about, the summer of 1997. (Paquet Dep. at 37).[11] Although he does not explicitly do so, Paquet may be trying to create an inference of causation from the timing of the instructions, in relation to his memo on same-sex partner benefits. As with the investigation and

---

[11] The evidence produced by Paquet in support of this contention is scant and, even when viewed in the light most favorable to Paquet, does not prove much. Paquet cites only his own deposition testimony, in which he stated that he was told by two other Pace employees, Brenda Clarke and Janice Anderson, that they were told by their respective supervisors to avoid associating with Paquet. (Paquet Dep. at 37, 41-44). Apparently, neither of these employees worked in the same department as Paquet, and Paquet admits that he has no basis for believing that the instructions were based on his homosexuality. Paquet has no evidence that anyone else at Pace was ever so instructed.

reprimands, however, such an inference is not warranted on the record here. Given the overall course of events at that time, Pace's instructions could have been motivated by a number of factors - most obviously, the suspicious e-mails. Thus, an intervening cause precludes the inference from timing alone. Furthermore, **Paquet** admits that he has no reason to believe that Pace's directives were motivated by discriminatory animus. (Paquet Dep. at 43-44). Paquet simply does not know whether Pace's instructions to other employees had anything at all to do with his sexual orientation. (Paquet Dep. at 44). Without providing any link whatsoever between Pace's instructions to other employees and his sexual orientation, the court finds no support for an inference that Pace was discriminating against Paquet because of his sexual orientation.

Even when viewing all of the facts in the record in the light most favorable to Paquet, and considering all of the circumstances as a whole, the court finds that no reasonable jury could conclude that Paquet was subjected to a hostile work environment because of his sexual orientation. Pace is entitled to summary judgment on Paquet's hostile work environment claim.

## II. First Amendment

Count I of Paquet's complaint alleges that defendants, in retaliation for Paquet's protected speech on homosexual issues, engaged in "a pattern of systematic discrimination and retaliation against Paquet and have subjected Paquet to numerous adverse employment actions." Paquet relies on the same evidence of adverse actions for this claim as for his equal protection claims. In order to succeed on a First Amendment retaliation claim under § 1983, a plaintiff must demonstrate 1) that the speech touches upon matters of public concern, and 2) that the speech was a substantial or motivating factor in the defendant's actions. *See Knapp v. Whitaker*, 757

F.2d 827, 845 (7th Cir. 1985) (citing, *inter alia, Connick v. Myers*, 461 U.S. 138 (1983));

*Thomsen v. Romeis*, 198 F.3d 1022, 1027 (7th Cir. 2000). As to the second prong, a plaintiff

"cannot prevail unless he establishes that the defendant would not have taken the challenged

actions "but for" the constitutionally protected conduct. *See Thomsen*, 198 F.3d at 1027. If the

plaintiff meets the burden of establishing these two requirements, then the defendant may

demonstrate, by a preponderance of the evidence, that it would have made the same decisions

even if the plaintiff had not engaged in the protected speech. *See Knapp*, 757 F.2d at 844; *Mt.*

*Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977). Aside from this framework, the

Supreme Court has also stated that an employer is not liable for retaliation if the interests of the

state employer in promoting effective and efficient service outweigh the employee's interests in

commenting on matters of public concern. *See Pickering v. Board of Educ. of Township H.S.*

*Dist.*, 391 U.S. 563, 567-68 (1968); *Knapp*, 757 F.2d at 839.

In this case, Pace contends that Paquet has not met its burden as to either of the two initial

requirements. First, Pace argues that none of Paquet's speech touched upon a matter of public

concern. Second, Pace argues that Paquet has not produced sufficient evidence to permit a

reasonable jury to conclude that Paquet's speech was a substantial or motivating factor in any of

its decisions that adversely affected Paquet. The court declines to address the public concern

question, because it agrees with Pace that Paquet has not shown a connection between the

protected speech and the adverse actions, with one exception.

In response to Pace's contention that Paquet fails to meet the second requirement, Paquet

states only that the evidence presented in connection with the equal protection claims establishes

the link. Paquet argues simply that,

> [t]he suspicious timing of Plaintiff's reprimand and demotion
> coupled with the openly hostile work environment at Pace,
> including the public removal of Plaintiff from the
> harassment/discrimination training session for insisting that the law
> regarding sexual orientation be accurately communicated, *at the
> very least* gives rise to the reasonable inference that Plaintiff's
> exercise of his right to free speech regarding homosexual issues
> was a motivating factor in Defendants' actions.

(Pl.'s Resp. at 15) (emphasis in original). Paquet asks the court to make an impermissible

inference. As to the timing of the reprimand[12] and demotion, the Seventh Circuit has expressly

held that timing alone is insufficient to support an inference of retaliation. *See Roberts v. Broski,*

186 F.3d 990, 995 (7th Cir. 1999) (citing *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362,

1368 (7th Cir. 1993)). As to the "openly hostile environment," Paquet, as noted above, has not

presented sufficient evidence to link the conditions he complains of with homosexuality in any

way. Paquet simply fails to link Pace's actions to his homosexuality or his speech on

homosexuality issues.

   The one alleged action that gives the court pause is Paquet's exclusion from the training

session. There can be no doubt but that this action was taken in response to Paquet's conduct or

speech at that session. The court, however, concludes that no reasonable jury could find that this

action was taken in retaliation for Paquet's protected speech on the issue, but rather was taken

because Paquet insisted on disrupting the class unless the instructor admitted that Paquet's

position on the ordinance was correct. Under the *Pickering* balancing test, Pace's interests in

efficiency clearly outweighed Paquet's interests in engaging in protected speech at the training

session. This is evident from Paquet's responses to Pace's statement of facts. Paragraphs 66

---

[12] It is not even clear that a reprimand constitutes an adverse action for purposes of a First
Amendment retaliation claim. *See Thomsen*, 198 F.3d at 1027-28.

through 69 of Pace's statement of facts, dealing with the training session, are not disputed by

Paquet. Paragraph 68 reads as follows:

> 68. When the instructor declined to discuss the issue, Plaintiff
> insisted that he discuss it and refused to let the matter drop. It was
> at that point that the instructor left the class and sought Paquet's
> supervisor to speak with him or ask him to leave the class. Tab F,
> Anderson Dep., p. 50.
> RESPONSE: Undisputed.

(Pl.'s Resp. to Def.'s Statemt. of Fact, ¶ 68).[13]

Under the balancing test propounded by the Supreme Court in *Pickering*, a public

employer does not violate an employee's First Amendment rights by subjecting the employee to

an adverse action if the speech inflicts an injury on the government's efficiency interests that

outweighs the employee's interest in the speech. 391 U.S. at 567-68; *see also Greer v. Amesqua*,

212 F.3d 358, 371 (7th Cir. 2000). In conducting this balancing test a number of factors must be

considered. The court will not reiterate all of the factors here, but will discuss only those

relevant to this case.[14] Most significantly, the court must consider whether the speech would

create problems in maintaining discipline or harmony among co-workers. The court must also

consider the time, place, and manner of the speech, as well as the context in which the underlying

dispute arose. Also relevant is whether the speech impeded the employee's ability to perform her

responsibilities.

---

[13] It is clear from a review of the deposition transcripts that Paquet not only wanted the
instructor to discuss sexual orientation issues, but wanted him to admit that sexual orientation
was a protected class under the local ordinance, and that the ordinance protected Pace employees.
(Anderson Dep. at 36, 47, 50).

[14] For the complete list, see *Greer*, 212 F.3d at 371. Because the *Pickering* and *Greer*
cases involved different factual circumstances, some of the factors are inapplicable.

Here, the factual circumstances in which Paquet's speech was conducted are especially significant. Paquet was at a training session with other employees, and he admits that he intended to prevent the training session from proceeding unless the instructor discussed the applicability of the ordinance to homosexuals at Pace. Paquet's conduct prevented the instructor from performing his responsibilities in conducting the training session. Also relevant is the potential legal effect such an admission would have had. At the time of the training session, Paquet was involved in litigation against Paquet concerning the proper interpretation of the ordinance. After Paquet made it known to the instructor and the class that he thought the local ordinance protected homosexuals, he could have allowed the instructor to move on and continue the session. Instead, he refused to drop the matter, threatening to continue disrupting the class. Paquet has a right to express his opinions, but he does not have the right to force another to agree with him. Moreover, there is no evidence that Pace attempted to restrict Paquet from engaging in speech on the topic other than in the particular context of the training session. Nothing in the record suggests that Pace retaliated against Paquet for any other speech on homosexuality issues at any other time or place. In sum, Pace's interest in being able to conduct a training seminar on discrimination for its employees outweighed Paquet's narrow speech interest in not simply raising the issue, but pressing for an admission from Pace at the training session. *See Knapp*, 757 F.2d at 842 (noting that the "initial, and often determinative, question is whether the speech interferes with the employee's work or with the efficient and successful operation of the office."). Indeed, Paquet's conduct at the training session appears to have been *designed* either to disrupt the functioning of the office or to elicit an admission. In light of the context, no reasonable juror could possibly conclude that Paquet's interests in that manner of speech outweighed Pace's

interests in continuing the training session in an orderly manner.

Paquet's evidence of retaliation for protected speech is insufficient to create any triable questions of fact as to his § 1983 First Amendment claim. Thus, Pace is entitled to summary judgment as to Paquet's First Amendment retaliation claim.

## Conclusion

For the foregoing reasons, Pace's motion for summary judgment in granted in all respects. The court recognizes that Paquet has been granted the opportunity to conduct additional discovery, limited in scope to the denial of his application for a promotion in March, 2000. (Min. Order, 1/10/01). This denial could potentially support an independent claim of disparate treatment, if Paquet is able to meet the elements of an equal protection claim under § 1983. For that reason, should Paquet seek to amend his complaint by substituting this event as a new basis for a discrimination claim, the court will grant him leave to do so. Evidence of the events in the record as it now stands will not be reconsidered as the basis for any claims in an amended complaint, except as background evidence. Any motion to amend must be filed within 30 days, or final judgment will be entered in favor of defendants.

ENTER:


JOAN B. GOTTSCHALL
United States District Judge

DATED: March 29, 2001